UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Natalie A. Chairez and Samantha G. Chairez, | Case No. _____ |
| Plaintiffs, | |
| vs. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| AW Distributing, Inc., Walmart Inc., Wal-Mart Stores, Inc., Wal-Mart Stores East, LP, Wal-Mart Stores East, LLC, and John Doe Company Defendants #1–10, | |
| Defendants. | |

COME NOW, Plaintiffs, who for their causes of action against Defendants, state and allege:

**<u>INTRODUCTION</u>**

1.    Inhalant abuse has been known and prevalent in the United States for decades.  Many common household products are used to get high because they are cheap and easily accessible, such as aerosols, glue, cleaning fluids, and gasoline, as examples.

2.    One type of inhalant that people commonly abuse to get high is computer dust remover sprays.  These products are compressed gas in a can that are used to spray off dust and debris from whatever surface is being cleaned.  However, they contain a gas—difluoroethane—that, if inhaled, causes the person to lose consciousness and control of the bodily movements nearly immediately.

3.     These dust removers are cheap and available at retail locations throughout the United States, meaning anyone with a few dollars can purchase the product to get high.  Dust removers are popular among inhalant abusers, so much so that the companies who design, manufacture, distribute, and sell these products profit greatly as a result.  Manufacturers, distributors, and sellers of dust removers— such as AW Distributing, Inc., Walmart Inc., Wal-Mart Stores, Inc., Wal-Mart Stores East, LP, and Wal-Mart Stores East, LLC (collectively "Defendants")—know that people inhale their dust removers to get high.

4.     Dust remover abuse comes at a terrible price for many innocent bystanders.  Because dust remover is so cheap, highly accessible, and produces such a quick high, people abuse them nearly anywhere, including while driving.  When someone gets high on dust remover while driving, they can quickly lose consciousness or control of their bodily movements and crash their vehicle, often resulting in catastrophic and deadly results.

5.     There have been numerous public reports of deaths and injuries to innocent bystanders caused by people driving while high on dust removers stretching back for at least twenty years.  The manufacturers, distributors, and sellers of these dust removers are fully aware of these predictable and foreseeable injuries and deaths.   Every one of these injuries and deaths was preventable, yet the manufacturers, distributors, and sellers of these dust removers—like Defendants— have failed to deter or prevent people from inhaling their dusting sprays.

6.     Two people in particular whose injuries were foreseeable and preventable were a mother and daughter in Sherburne County, Minnesota.  On or about December 17, 2017, Natalie Chairez and her daughter Samantha Chairez were driving eastbound on Highway 10 in Sherburne County, Minnesota, and a man named Tyler Harmon was driving his motor vehicle while high on Ultra Duster, westbound on the same highway.  Predictably and foreseeably, Tyler Harmon lost control of his vehicle, crossed over the median, and drove into oncoming traffic on the opposite side of the highway while high on Ultra Duster until he struck the vehicle the mother and daughter were driving in.  Natalie Chairez's and Samantha Chairez's injuries would have been avoided altogether if Defendants had not negligently and defectively designed, manufactured, distributed, and sold Ultra Duster, knowing it was reasonably foreseeable that someone would inhale Ultra Duster to get high while driving and strike and harm or kill innocent bystanders like Natalie Chairez and Samantha Chairez.

## PARTIES, JURISDICTION, AND VENUE

### The Chairez Family

7.     Natalie Chairez is an adult resident of St. Paul, Ramsey County, Minnesota.  Natalie Chairez was at all material and relevant times a resident of Vadnais Heights, Ramsey County, Minnesota.

8.     Samantha Chairez is currently an adult resident of West Fargo, Cass County, North Dakota.  Samantha Chairez was at the time of the crash, a permanent

3

resident of Vadnais Heights, Ramsey County, Minnesota, while attending college in Grand Forks, Grand Forks County, North Dakota.

## The Defendants

9.      Defendant AW DISTRIBUTING, INC., (hereinafter "AW Distributing") is a California registered Corporation with its principal place of business located in California.   At all material and relevant times, AW has been engaged in the designing, testing, producing, processing, assembling, formulating, inspecting, researching, promoting, labeling, marketing, advertising, distributing, and selling of Ultra Duster for ultimate sale and use in the United States, including within the State of Minnesota.

10.      Defendant WALMART INC. is a Delaware corporation with its principal place of business located in Bentonville, Arkansas.  Walmart Inc. owns and operates many retail stores within the state of Minnesota and is registered to do business and receive service of process in Minnesota.   WAL-MART STORES, INC. formally changed its name to Walmart Inc. in 2018.  Defendant WAL-MART STORES EAST, LP is a Delaware limited partnership with its principal place of business located in Bentonville, Arkansas.  Defendant WAL-MART STORES EAST, LLC. is a Delaware limited liability corporation with its principal place of business located in Bentonville, Arkansas.  Upon information and belief, Wal-Mart Stores East, LP and Wal-Mart Stores East, LLC are subsidiaries of Walmart Inc.  (Walmart Inc. and any of its affiliates, subsidiaries, successors or assigns, including Wal-Mart Stores, Inc., Wal-Mart Stores East, LP, Wal-Mart Stores East, LLC are referred to collectively as

"Walmart").  At all material and relevant times, Walmart was involved in the designing, testing, producing, processing, assembling, formulating, inspecting, researching, promoting, labeling, marketing, advertising, distributing, and selling of Ultra Duster for ultimate sale and use in the United States, including within the State of Minnesota.

11.     John Doe Company Defendants #1–10, whose specific identities are currently unknown to Plaintiffs, are the individuals, business entities, and corporations within the chain of commerce that sold, distributed, designed, and/or manufactured Ultra Duster for marketing, sale, and distribution into the stream of commerce, including within the State of Minnesota, to Tyler Harmon and other consumers and users.  The pseudonymous designations are being used to preserve claims against these parties who will be named more fully if and when their identities are discovered.

12.     At all material and relevant times, AW Distributing and Walmart (hereinafter and collectively "Defendants") were all active and knowing participants in the chain of commerce that resulted in the designing, manufacturing, distributing, selling, and purchasing of Ultra Duster that resulted in the severe injuries of a Minnesota mother, Natalie Chairez, and her daughter, Samantha Chairez.  At all material and relevant times, all Defendants exercised significant control over the designing, manufacturing, distributing, selling, and purchasing of Ultra Duster.

13.     Accordingly, this action, based in part on strict liability, may be commenced and maintained against all Defendants pursuant to Minn. Stat. § 544.41.

## Jurisdiction & Venue

14.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between Plaintiffs and Defendants, and the amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000), exclusive of interest, costs and disbursements.

15.     This Court has personal jurisdiction over all Defendants because at all material and relevant times, Defendants' Ultra Duster product caused injuries in the State of Minnesota, resulting in the severe injuries of a Minnesota mother and daughter, Plaintiffs Natalie Chairez and Samantha Chairez, and the deaths of other Minnesota residents.  Defendants' Ultra Duster product was involved in motor vehicle crashes in multiple states, including the State of Minnesota, and was defective and without proper, reasonable, and necessary warnings, labels, or instructions.  Defendants have transacted business in the State of Minnesota, have continuous and systematic contacts with the State of Minnesota, have purposely targeted their commercial activities at residents within the State of Minnesota, including the sale of the Ultra Duster product at issue, engaged in distribution agreements to sell their Ultra Duster product to all fifty states, including the State of Minnesota, and have consented to jurisdiction in the State of Minnesota.  Upon information and belief, Defendants have sold and distributed hundreds of thousands of their Ultra Duster product within the State of Minnesota each year, advertised in the State of Minnesota, made material omissions and representations in the State of Minnesota, carried product liability insurance coverage for acts and omissions in the

State of Minnesota, and breached warranties in the State of Minnesota. Defendants'
Ultra Duster product has—and continues to—kill and seriously injure Minnesota
residents. Defendants have purposefully availed themselves of the privilege of
conducting business activities within the State of Minnesota, thus invoking the
benefits and protections of its laws.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 18
U.S.C. § 1965 because a substantial part of the events and omissions giving rise to
this action occurred in the State of Minnesota, Sherburne County, and because all
Defendants are subject to this Court's exercise of personal jurisdiction.

## FACTS

## INHALANT ABUSE

17.     Inhalant abuse has been a public health issue in the United States for
many years and continues to this day.[1]

18.     Inhalant abuse is the deliberate inhaling or sniffing of common products
found in homes and schools to get high.[2]

---

[1] National Institute on Drug Abuse, *Review of Inhalants: Euphoria to Dysfunction*
(Oct. 1977),
http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.152.2815&rep=rep1&type=
pdf#page=23.
[2] United States Consumer Product Safety Commission, *A Parent's Guide to
Preventing Inhalant Abuse: "Inhalant Abuse: It's Deadly. Inhalant Abuse Can Kill,"*
https://www.cpsc.gov/safety-education/safety-guides/containers-and-
packaging/parents-guide-preventing-inhalant-abuse (last visited Apr. 27, 2020).

19.     Inhalants include a variety of products, such as nitrous oxide, cleaning fluids, aerosols, gasoline, and spray paint.[3]

20.     Inhalants are known to be abused for their intoxicating effects because they are often cheap, easily accessible, and easy to conceal.[4]

21.     Numerous organizations and governmental entities dedicate resources to raising awareness of inhalant abuse, such as the National Institute on Drug Abuse, Substance Abuse and Mental Health Services Administration, and American Addiction Centers.

22.     The National Institute on Drug Abuse has stated that the number of inhalant-related deaths in the United States was approximately 100-200 people per year as of July, 2012.[5]

23.     In 2018, the National Survey on Drug Use and Health reported that approximately two million people over 12 years old have used inhalants in the past.[6]

---

[3] Substance Abuse and Mental Health Services Administration, *Key Substance Use and Mental Health Indicators in the United States: Results from the 2018 National Survey on Drug Use and Health.* https://www.samhsa.gov/data/sites/default/files/cbhsq-reports/NSDUHNationalFindingsReport2018/NSDUHNationalFindingsReport2018.pdf (last visited Apr. 27, 2020).
[4] Carrie E. Anderson, M.D. & Glenn A. Loomis, M.D., *Recognition and Prevention of Inhalant Abuse,* American Family Physician,  (Sep. 1, 2003), https://www.aafp.org/afp/2003/0901/p869.html.
[5] National Institute on Drug Abuse, *Inhalants: What are the Medical Consequences of Inhalant Abuse?,* https://www.drugabuse.gov/publications/research-reports/inhalants/what-are-other-medical-consequences-inhalant-abuse (last updated July 2012).
[6] Substance Abuse and Mental Health Services Administration, *Key Substance Use and Mental Health Indicators in the United States: Results from the 2018 National Survey on Drug Use and Health.*

24.     American Addiction Centers refers to inhalant abuse as "the forgotten drug epidemic."[7]

25.     According to Sara Stickler, Executive Director of the Alliance for Consumer Education, inhalant-related deaths are vastly underreported: "You're looking in the hundreds probably, annually, just from the alerts and the cases we are able to track on our own.  But there's probably many, many more that are being recorded as something else."[8]

## COMPRESSED GAS DUSTING SPRAYS

26.     One particular category of inhalants that are known to be abused for their intoxicating effects is compressed gas dusting sprays.[9]

27.     Compressed gas dusting sprays are often referred to in many different ways, including "keyboard cleaner," "electronics cleaner," "computer cleaner," "dusting spray," "canned air," "compressed gas cleaner," "compressed gas duster," as

---

https://www.samhsa.gov/data/sites/default/files/cbhsq-reports/NSDUHNationalFindingsReport2018/NSDUHNationalFindingsReport2018.pdf (last visited Apr. 27, 2020).

[7] American Addiction Centers, *The Dangers of Inhalants,* https://americanaddictioncenters.org/inhalant-abuse (last updated June 10, 2019).

[8] Carter Sherman, *Inhalants — The Easy to Acquire but Deadly Drug That Nobody Talks About*, Houston Press (September 6, 2016), https://www.houstonpress.com/news/inhalants-the-easy-to-acquire-but-deadly-drug-that-nobody-talks-about-8730670.

[9] Substance Abuse and Mental Health Services Administration, *Key Substance Use and Mental Health Indicators in the United States: Results from the 2018 National Survey on Drug Use and Health*, https://www.samhsa.gov/data/sites/default/files/cbhsq-reports/NSDUHNationalFindingsReport2018/NSDUHNationalFindingsReport2018.pdf (last visited Apr. 27, 2020).

examples. For purposes of this Complaint, this category of products will be referred to as "dust remover" or "dust removers."

28.    Dust removers typically share similar characteristics, both physically and chemically.

29.    Dust removers are physically similar in that they are sold in a handheld can that is topped by a spray nozzle and an actuator trigger that opens a valve to release a pressurized stream of pressurized gas through and out the spray nozzle.

30.    Dust removers are nearly identical in appearance and function, which is to spray a highly pressurized gas out of the can to clear a surface of dust and debris.

31.    Defendants, for example, at all material and relevant times and upon information and belief, designed, manufactured, tested, labeled, distributed, and/or sold a dust remover called Ultra Duster.



32.     At all material and relevant times, the function of Ultra Duster was similar to other dust removers on the market, which was to "blast dust, dirt, and unwanted micro-articles away from computers, keyboards, printers plus many more."[10]

33.     At all material and relevant times, Defendants advertised and marketed Ultra Duster as a "compressed gas air duster" that "blast[s] dust, dirt, and unwanted micro-articles away from computers, keyboards, printers plus many more."[11]

[Remainder of Page Intentionally Blank]

---

[10] AW Distributing, Inc., *Ultra Duster Product Description,* http://www.awdus.com/products_01_01.html.

[11] AW Distributing, Inc., *Ultra Duster Product Description,* http://www.awdus.com/products_01_01.html.

34.     The primary function of a similar product, 3M Dust Remover, according to its manufacturer, is to "to "Remove[] Dust & Lint in Home or Office."[12]  3M Dust Remover is marketed as a "Compressed Gas Duster."



[Remainder of Page Intentionally Blank]

---

[12] 3M Company, *Ultra Duster Label*,
http://www.3m.com/us/office/advisory/Artwork3MDustRemoverApprovedOctober2008.pdf.

35.     The primary function of another similar product, Dust-Off branded dust remover, according to its manufacturer, is to "provide potent dust-removing power for practically any task.  Use in your office space to clean keyboards, CPU, laptop, or desk area.  Great for removing dust around the home like window blinds, collectibles, sewing machines, holiday ornaments, craft projects and silk flower arrangements."[13]



[Remainder of Page Intentionally Blank]

---

[13] Falcon Safety Products, Inc., *Dust-Off Product Description*, https://falconsafety.com/shop/dusters/disposable/disposable-duster-10-oz/.

36.     The primary function of a similar product, CRC Duster, according to its manufacturer, is to "provide[] a powerful blast of product to remove embedded debris without damaging sensitive components or surface finishes."[14]



37.     Dust removers are chemically similar in that they typically contain a pressurized volatile, fluorinated hydrocarbon gas called 1-1, difluoroethane (hereinafter "difluoroethane" or "DFE").[15]

38.     DFE is used in many consumer products—such as deodorants, hair spray, mousse, air fresheners, disinfectants, household cleaners, and automotive

---

[14] CRC Industries, Inc., *CRC Duster Product Description,* https://www.crcindustries.com/products/duster-8482-moisture-free-dust-lint-remover-8-wt-oz-05185.html.

[15] Falcon Safety Products, Inc., *Dust-Off Compressed Gas Duster Safety Data Sheet*, https://falconsafety.com/wp-content/uploads/SDS_dust-off-compressed-gas-duster.pdf.

cleaners and waxes—as an aerosol propellant or foaming agent to propel the main product out of its container or create the foaming properties of certain products.[16]

39.     Because DFE is a central nervous system depressant, when inhaled, it causes debilitating and impairing effects such as unconsciousness, drowsiness, dizziness, and suffocation.[17]

40.     Inhaling products that contain DFE can also cause paralysis, which partially or completely interferes with a person's ability to move normally or control their bodily movements.[18]

41.     The impairing effects of inhaling products containing DFE commonly result in dizziness, loss of inhibitions, inability to make sound decisions, and slurred speech.[19]

_____

[16] National Center for Biotechnology Information, PubChem Database, 1,1-Difluoroethane, CID=6368, https://pubchem.ncbi.nlm.nih.gov/compound/1%2C1-difluoroethane#section=Use-and-Manufacturing (last visited Apr. 27, 2020).
[17] International Programme on Chemical Safety,  Internationally Peer Reviewed Chemical Safety Information, 1,1-Difluoroethane, ISCS: 1729 (March 2009), http://www.inchem.org/documents/icsc/icsc/eics1729.htm;
Novotny, Clara B et al., "Acute Psychosis Following 1,1-Difluoroethane Inhalation," *Cureus* vol. 11,9 e5565, Sep. 4, 2019, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6820689/;
Alexis L. Cates and Matthew D. Cook, "Severe Cardiomyopathy after Huffing Dust-Off," *Case Reports in Emergency Medicine*, vol. 2016, Article ID 9204790 (2016), https://www.hindawi.com/journals/criem/2016/9204790/#B2.
[18] American Addiction Centers, *Huffing Canned Air or Dust-Off: Side Effects, Signs, and More.*
https://americanaddictioncenters.org/inhalant-abuse/side-effects (last updated Jun. 17, 2019).
[19] *Id.*

42.     When inhaled, DFE can also cause death by cardiac arrest.[20]

43.     As early as 1936, scientists began testing fluorinated hydrocarbons as a potential surgical anesthesia because of their analgesic effects.[21]

44.     Researchers continued their research into the anesthetic properties of fluorinated hydrocarbons in 1960, specifically testing DFE on dogs and human volunteers.[22]

45.     The volunteer human testers inhaled the DFE and "noted good analgesia and impending loss of consciousness."[23]

46.     While the DFE exhibited good anesthetic properties, researchers eliminated DFE as a possible surgical anesthetic because of its explosive properties.[24]

47.     According to the American Addiction Centers, inhaling DFE also causes immediate psychoactive, intoxicating-like side effects, such as a rush of euphoria, hallucinations, and delusions.[25]

---

[20] Avella, Joseph et al., "Fatal Cardiac Arrhythmia After Repeated Exposure to 1,1-Difluoroethane (DFE)," *The American Journal of Forensic Medicine and Pathology*. 27(1):58-60 (March 2006), https://www.ncbi.nlm.nih.gov/pubmed/16501351 [abstract].

[21] Harold Booth & May E. Bixby, "Fluorine Derivatives of Chloroform," *Industrial and Engineering Chemistry*, 24(6):637-41 (June 1932), https://pubs.acs.org/doi/pdf/10.1021/ie50270a012 [first page].

[22] Alan Poznak and Joseph F. Artusio, Jr., "Anesthetic Properties of a Series of Fluorinated Compounds: I. Fluorinated Hydrocarbons," *Toxicology and Applied Pharmacology*, vol. 2(4):363-73 (July 1960), https://www.sciencedirect.com/science/article/pii/0041008X60900028 [abstract].

[23] *Id.*

[24] *Id.*

[25] American Addiction Centers, *Huffing Canned Air or Dust-Off: Side Effects, Signs, and More.* https://americanaddictioncenters.org/inhalant-abuse/side-effects (last updated Jun. 17, 2019).

48.     Because of these effects, DFE is, and has been at all material and relevant times, a popular substance of abuse.[26]

49.     In fact, reports started surfacing in the 1960s of teenagers dying after inhaling volatile hydrocarbons similar to DFE.[27]

50.     DFE use can lead to addiction, which is a form of Substance Abuse Disorder.[28]

51.     Reports of people getting hurt, dying, and killing and injuring others after inhaling products containing DFE, such as dust removers, continue to this day.

## DUST REMOVER ABUSE

52.     Predictably and foreseeably, when a person intentionally inhales a propellant—such as a dust remover containing DFE—that person frequently exhibits some or all of the aforementioned adverse health effects along with the sought-after intoxicating, psychoactive side effects.

53.     Reports of dust remover abuse in the public domain are numerous and easily accessible, for example by a simple online search of widely available public media, like newspapers.

---

[26] Regina Liu & Thomas Blair, MD, *Skeletal Fluorosis and "Sniffer's Dermatitis" After Inhalant Abuse with 1,1-Difluroethane*, *Proceedings of UCLA Health*, vol. 23 (2019), https://www.proceedings.med.ucla.edu/wp-content/uploads/2019/03/Liu-A190213RL-BLM-edited.pdf.
[27] *Id.*
[28] National Institute on Drug Abuse, *Inhalants: What are Inhalants?*, https://www.drugabuse.gov/publications/drugfacts/inhalants (last updated April 2020).

54.     Reports of people getting high on dust remover, driving, and causing harm and death to others are also numerous, easily accessible, and in the public domain.

55.     Governmental agencies, organizations, researchers, and media from around the country have compiled data and reported on people intentionally inhaling propellants, including dust removers since at least the 1990s.

56.     It is clear, and has been clear at all material and relevant times, that people have been abusing dust removers to get high and continue to do so this day.

57.     It is clear, and has been clear at all material and relevant times, that people will drive while high on dust removers.

58.     It is clear, and has been clear at all material and relevant times, that people will cause injuries and death to innocent bystanders while driving high on dust removers.

[Remainder of Page Intentionally Blank]

59.    Researchers have reported that while inhalant abuse—such as sniffing gasoline or paint—in general has been in decline over time since 1993, propellant abuse—such as intentionally inhaling dust remover—specifically increased starting around 1998 and started to skyrocket around 2003:[29]



60.    This same study calculated that dust remover comprised about 57% of all propellant abuse during this same time frame.[30]

---

[29] Melinda R. Marsolek, et al., *Inhalant Abuse: Monitoring Trends by Using Poison Control Data, 1993-2008*, Pediatrics, 125(5) 906-913 (May 2010), https://pediatrics.aappublications.org/content/125/5/906#T1.
[30] *Id.*

61.   In 1997, a woman struck and catastrophically injured another driver when the woman lost control of her vehicle after getting high on dust remover while driving.[31]

62.   In 1997, researchers published a case report of two individuals who died when their vehicle crashed after the driver got high from inhaling a can of propellant containing DFE.[32]

63.   In 1999, five high school juniors in Pennsylvania were killed when the driver ran her vehicle off the side of the road and struck a tree after getting high on dust remover; three of the passengers were also reported to have DFE in their system.[33]

64.   Almost exactly two years later in 2001, a Pennsylvania teenager died when she veered off the road and crashed her vehicle after she got high from dust remover.[34]

---

[31] Craig Peters, *Woman Submits Plea in Huffing Crash*, GoUpstate.com (Sep. 12, 2008),   https://www.goupstate.com/news/20080912/woman-submits-plea-in-huffing-crash.

[32] LA Broussard, et al., *Two Traffic Fatalities Related to the Use of Difluoroethane*, J. Forensic Sci.,42(6):1186–7 (Nov. 1997), https://www.ncbi.nlm.nih.gov/pubmed/9397568 [abstract].

[33] Michael Janofsky, *Fatal Crash Reveals Inhalants as Danger to Youth*, N.Y. Times (Mar. 2, 1999), https://www.nytimes.com/1999/03/02/us/fatal-crash-reveals-inhalants-as-danger-to-youth.html.

[34] Katrina Macleod, *Coroner Says Inhalant Use Led to Fatality*, Daily Local News (Feb. 24, 2001), https://www.dailylocal.com/news/coroner-says-inhalant-use-led-to-fatality/article_76cc60a8-1de0-5aa7-94c5-43dd18fb828d.html.

65.   In June of 2001, a teenager in Indianapolis died after getting high on dust remover in a swimming pool, where he drowned when his heart stopped.[35]

66.   The United States Consumer Product Safety Commission operates an injury surveillance system known as the National Electronic Injury Surveillance System ("NEISS"). The purpose of the NEISS is to collect and publish data on consumer product-related injuries occurring in the United States, including aerosol inhalant-related injuries, by cataloging some emergency room visits from 1997-2010.[36]

67.   The NEISS's first record of a computer duster-specific injury is 2002:

---

**Date:** 01/22/2002          **Age:** 14 years          **Sex:** Male          **Race:** White
**Location:** Not recorded          **Fire:** No fire involvement or fire involvement not recorded
**Body part:** All Of Body          **Diagnosis:** Poisoning
**Product:** Aerosol containers
14 YOM INHALED AEROSOL "PERFECT DUSTER ' STATES " I NEEDED TO GET HIGH; PCC CONTACTED
**Disposition:** Treated and transferred to another hospital

---

68.   There are dozens of reports of dust remover abuse clearly identified in the NEISS from 2002–2010.[37]

---

[35] *Car Crash at Regatta Draws Attention to Inhalant Use*, Madison Courier (July 25, 2006), https://madisoncourier.com/Content/News/News/Article/Car-crash-at-Regatta-draws-attention-to-inhalant-use/178/961/31258.

[36] National Electronic Injury Surveillance System, *Accidents-Aerosol Containers-Years 1997-2010-All of Body*, http://www.hospital-data.com/accidents/1133-aerosol-containers/all-of-body/index.html (last visited Apr. 27, 2020).

[37] *Id.*

69.   In 2004, researchers published a research article reviewing the death of a person associated with inhaling dust removers.[38]

70.   In 2005, Today.com alerted its readers to the increasing danger of "dusting," or inhaling dust remover after several children were killed after getting high on dust remover in separate incidents.[39]

71.   In 2006, a woman died after getting high on 3M Dust Remover that she purchased from Walmart.[40]

72.   In 2006, researchers published a research article reviewing the death of a person associated with getting high on dust removers and other products containing DFE.[41]

73.   In 2006, researchers published a case report of an individual who had crashed her vehicle and died after getting high on dust remover.[42]

---

[38] Z. Xiong et al., *Sudden Death Caused by 1,1-difluorethane Inhalation*, J. Forensic Sci., 49(3):627-9 (May 2004), https://www.ncbi.nlm.nih.gov/pubmed/15171188 [abstract].

[39] Peter Alexander, *"Dusting" is the New Killer High for Teens*, Today (Jul. 26, 2005), https://www.today.com/parents/dusting-new-killer-high-teens-2D80555302.

[40] *Wal-Mart, 3M Sued in Teenager's Death from Solvent*, Reuters (May 31, 2007), https://www.reuters.com/article/us-walmart-huffinglawsuit/wal-mart-3m-sued-in-teenagers-death-from-solvent-idUSN3122706820070531.

[41] Avella, Joseph et al., *Fatal Cardiac Arrhythmia After Repeated Exposure to 1,1-Difluoroethane (DFE)*, The American Journal of Forensic Medicine and Pathology, 27(1):58-60 (March 2006), https://www.ncbi.nlm.nih.gov/pubmed/16501351 [abstract].

[42] T. Hahn et al., *A Motor Vehicle Accident Fatality Involving the Inhalation of 1,1-Difluoroethane*, J. Analytical Toxicology, vol. 30(8):638-42 (Oct. 2006), https://www.ncbi.nlm.nih.gov/pubmed/17132266 [abstract].

74.    In 2006, a California TV news channel aired a special report on the dangers of huffing dust removers, focusing on the deaths of three teenagers who were believed to have been high on dust remover when their car crashed.[43]

75.    In 2007, a man was killed as he was walking in a parking lot when he was struck by a vehicle driven by a woman who was high on 3M Dust Remover-branded dust remover.[44]

76.    In 2007, a Nebraska man crashed his vehicle into a tree after getting high on 3M Dust Remover-branded dust remover.[45]

77.    In 2012, researchers published a case report identifying 17 deaths involving DFE at the San Diego County Medical Examiner's Office from 2007-2011.[46] Among those 17 reports of death involving DFE, "Case 3" identified the death of a 50-year-old male in a car crash.  Witnesses who saw the crash described the man as traveling approximately 65 mph when he "veered to the right across lanes, onto the shoulder, and down a steep embankment, overturning the vehicle many times."  An intact can containing DFE was found among the crash debris.

---

[43] KCRA3, *Huffing and Teens*, YouTube (Jun. 17, 2011), https://www.youtube.com/watch?v=b03ZSk8g40U.
[44] *Downing v. City of Dothan*, 59 So. 3d 16 (Ala. 2010), https://caselaw.findlaw.com/al-supreme-court/1539446.html.
[45] Sarah Schulz, *Teen Who Ran Over Police Officer Involved in Second Accident*, The Grand Island Independent, (Jan. 18, 2007), https://www.theindependent.com/news/teen-who-ran-over-police-officer-involved-in-second-accident/article_e545b1c0-af76-5a21-8062-935e80b0c920.html.
[46] Vance, Chris, et al., *Deaths Involving 1,1-Difluoroethane at the San Diego County Medical Examiner's Office*, Journal of Analytical Toxicology, Vol. 36(9):626-33 (Nov./Dec. 2012), https://academic.oup.com/jat/article/36/9/626/784617.

78.    In 2008, an Oklahoma man was arrested on charges of public intoxication after getting high on 3M Dust Remover-branded dust remover; the police found more than 200 cans of dust remover in the man's vehicle.[47]

79.    In 2008, researchers published a case report of an individual who had crashed his vehicle after getting high on dust remover.[48]

80.    In 2009, a Nebraska man was found unresponsive in his vehicle after getting high on 3M Dust Remover-branded dust remover.[49]

81.    In 2009, an Ohio teenager died when she crashed her car after getting high on dust remover that she purchased at Walmart.[50]

82.    In 2009, a Pennsylvania woman veered off the road after she got high on dust remover and struck and killed a teenager and seriously injured another teenager who were walking on a sidewalk.[51]

---

[47] *12-11 Crime Briefs*, The Edmond Sun (Dec. 10, 2008), https://www.edmondsun.com/news/local_news/crime-briefs/article_a7286710-e3da-51d4-b733-111878ece7e5.html. (last visited Jan. 7, 2020).

[48] Little, Jill et al., *Inhalant Abuse of 1,1-Difluoroethane (DFE) Leading to Heterotopic Ossification: A Case Report*, Patient Safety in Surgery, vol. 2(1):28, (Oct. 2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2584001/.

[49] *Talmage Man Arrested for Huffing in Hospital Garage*, Lincoln Journal Star (Aug. 11, 2009), https://journalstar.com/news/local/crime-and-courts/talmage-man-arrested-for-huffing-in-hospital-garage/article_172e2f0c-86af-11de-8056-001cc4c03286.html.

[50] *Teen Admits Huffing Before Fatal Crash*, 21WFMJ (Aug. 24, 2009), https://www.wfmj.com/story/10951585/teen-admits-huffing-before-fatal-crash.

[51] William Bender*, Cops: "Huffing" Cause of Fatal Delco Crash*, The Philadelphia Inquirer (Sep. 10, 2009), https://www.inquirer.com/philly/hp/news_update/20090910_Cops__Huffing_cause_of_fatal_Delco_crash.html.

83.     In 2009, a case study analyzed the death of a man who died after getting high on dust remover.[52]

84.     In 2009, a man in Wyoming was found guilty of aggravated vehicular homicide stemming from charges that he killed someone when he passed out while driving and high on dust remover.[53]

85.     In 2010, a man in Pennsylvania got high on dust remover he purchased at a local Walmart, veered into oncoming traffic, and struck and killed a music teacher.[54]

86.     In 2010, an Illinois teenager killed the passenger in his vehicle when he crashed after getting high on dust remover.[55]

87.     In 2010, the American Journal of Drug and Alcohol Abuse warned that dust remover abuse by adolescents was becoming a public health threat.[56]

---

[52] C. Sasaki, T. Shinozuka, *A Fatality Due to Inhalation of 1,1-Difluoroethane (HFC-152a) With a Peculiar Device*, Forensic Toxicology 27:45 (2009), https://link.springer.com/article/10.1007/s11419-008-0065-7.

[53] William Browning, *Casper Man Faces Felony DUI*, Billings Gazette (Apr. 18, 2011), https://billingsgazette.com/news/state-and-regional/wyoming/casper-man-faces-felony-dui/article_44842e90-1c24-5c11-bc49-4030c05dfd34.html.

[54] Jason Nark, *Cops: Man Did Drugs Before Crash that Killed Teacher*, The Philadelphia Inquirer (Oct. 12, 2010), https://www.inquirer.com/philly/hp/news_update/20101013_Cops__Man_did_drugs_before_crash_that_killed_teacher.html.

[55] Dave Haney, *Teen Gets Prison for Fatal Crash*, Peoria Journal Star (Aug. 20, 2011), https://www.pjstar.com/article/20110820/NEWS/308209911.

[56] Eric Garland, & Matthew Howard, *Inhalation of Computer Duster Spray Among Adolescents: An Emerging Public Health Threat?*, The American Journal of Drug and Alcohol Abuse, vol.36(6):320-24 (Jul. 21, 2010), https://www.tandfonline.com/doi/full/10.3109/00952990.2010.504874 [abstract].

88.     In 2010, a TV news station aired a report on several teenagers who crashed a car after getting high on dust removers, including 3M Dust Remover-branded dust remover.[57]

89.     A video uploaded to YouTube.com on November 27, 2010 shows at least one person inhaling dust remover while sitting in a parked car.[58]

90.     In 2011, a man in Wyoming was reported to have crashed his vehicle after getting high on dust remover.[59]

91.     Two days later, yet another man in Wyoming was reported to have crashed his vehicle after getting high on dust remover he purchased at a local Walmart beforehand.[60]

92.     A video posted to YouTube.com in 2011 shows a young man getting high on dust remover while sitting in the driver's seat of a vehicle.[61]

93.     Another video posted to YouTube.com in 2011 shows a young man getting high on dust remover while sitting in the driver's seat of a vehicle.  The young

---

[57] 40/29 News, *Police Say Teens High on Duster*, YouTube (Sep. 3, 2010), https://www.youtube.com/watch?v=K1hNUrWuYKo.

[58] @shurrden, *Bella Inhaling Dust Remover*, YouTube (Nov. 27, 2010), https://www.youtube.com/watch?v=7kRttfMkSro.

[59] William Browning, *Casper Man Faces Felony DUI*, Billings Gazette (Apr. 18, 2011), https://billingsgazette.com/news/state-and-regional/wyoming/casper-man-faces-felony-dui/article_44842e90-1c24-5c11-bc49-4030c05dfd34.html.

[60] *19-Year Old Faces DUI Charge After Allegedly Huffing*, Casper Star Tribune (Apr. 20, 2011), https://trib.com/news/local/casper/year-old-faces-dui-charge-after-allegedly-huffing/article_33bd9038-2683-5537-9ba4-9ac8d3e5ca19.html.

[61] @swifferkillsdogs, *Jimmy Huffing Dust Remover*, YouTube (Dec. 14, 2011), https://www.youtube.com/watch?v=FjlazUNE2-8.

man shares the can of dust remover with his passengers, who also inhale from the can.[62]

94.    In 2011, an Illinois man crashed his vehicle after getting high on dust remover, killing three of his passengers.[63]

95.    In 2011, a California woman crashed her vehicle after getting high on 3M Dust Remover-branded dust remover.[64]

96.    In 2011, researchers published a research article reviewing three deaths associated with inhaling dust removers.[65]

97.    In two videos posted to YouTube.com in 2011, several young men are shown getting high on dust remover in the woods; the resulting debilitating and mind-altering effects visibly present.[66]

98.    In 2012, researchers published a research article reviewing the death of a person associated with inhaling dust removers.[67]

---

[62] @allenpalin, *Doing Duster at Whataburger*, YouTube (Dec. 26, 2011), https://www.youtube.com/watch?v=GYRQN-7raLM&has_verified=1.

[63] *People v. Blakey*, 44 N.E.3d 1186 (Ill. App. Ct. 2015). https://caselaw.findlaw.com/il-court-of-appeals/1719505.html.

[64] Melissa Pinion-Whitt, *Madd to Honor Rialto Police Officer*, Los Angeles Daily News (Mar. 11, 2011, updated Aug. 28, 2017), https://www.dailynews.com/2011/03/11/madd-to-honor-rialto-police-officer/.

[65] C. Sasaki, T. Shinozuka, *A Fatality Due to Inhalation of 1,1-Difluoroethane (HFC-152a) With a Peculiar Device*, Forensic Toxicology, 27:45 (2009), https://www.ncbi.nlm.nih.gov/pubmed/20875935 [abstract].

[66] @theicedub, *Duster Trip Part 1*, YouTube (Apr. 29, 2011), https://www.youtube.com/watch?v=4yR9MJl3OQk; @theicedub, *Duster Trip Part 2*, YouTube (Apr. 29, 2011), https://www.youtube.com/watch?v=xdbH2PXS2kU.

[67] PC Kurniali et al., *Inhalant Abuse of Computer Cleaner Manifested as Angioedema*, American Journal of Emergency Medicine, 30(1): 265e3-5 (Jan. 2012), https://www.ncbi.nlm.nih.gov/pubmed/21295430 [abstract].

99.    In February of 2012, a woman struck and seriously injured two men who were standing in their own driveway after the woman lost control of her vehicle when she got high on dust remover.[68]

100.    A woman was convicted of third-degree murder in Pennsylvania after she huffed dust remover she purchased at a local Walmart before she struck and killed another driver in August of 2012.[69]

101.    In September 2012, a Vermont man struck and killed a teenager who was walking to her father's car after the man lost control of his vehicle when he got high on dust remover.[70]

102.    In October 2012, a man crossed the median and struck and killed two siblings after getting high on dust remover.[71]

---

[68] Julius Whigham II, *Woman, 19, Charged with DUI in Delray Beach Crash that Injured Two; Accused of "Huffing" Aerosol Can*, The Palm Beach Post (Oct. 23, 2012), https://www.palmbeachpost.com/article/20121023/NEWS/812023237.

[69] Steve Bauer, *Judge Rejects New Trial in Fatal Huffing Case*, StateCollege.com (June 10, 2015), http://www.statecollege.com/news/local-news/judge-rejects-new-trial-in-fatal-huffing-case,1464214/.

[70] Brent Curtis, *Man Guilty of Manslaughter in Crash While "Huffing,"* Times Argus Online (Jan. 17, 2015), https://www.timesargus.com/news/man-guilty-of-manslaughter-in-crash-while-huffing/article_f72d7085-c65c-5b5a-9420-dc234b33b782.html.

[71] *Man Sentenced for Crash that Killed Ole Miss Siblings*, WMC5 Action News (Sept. 23, 2013, updated June 30, 2013), https://www.wmcactionnews5.com/story/23505970/man-sentenced-for-crash-that-killed-ole-miss-siblings/.

103.    In 2012, a woman was charged with reckless homicide after local authorities said she struck and killed a five-year-old girl while driving high on dust remover.[72]

104.    In 2012, a TV station aired a story featuring a teenager who lost consciousness and caused a multi-vehicle crash after she got high on dust remover while driving.[73]

105.    In 2014, a TV news station reported a twenty-one-year-old had died after huffing dust remover.[74]

106.    In 2014, law enforcement in Greenwich, New York, were prompted to warn the public of the dangers associated with huffing after a man was hospitalized for inhaling dust removers.[75]

107.    In 2014, a woman suffered near-fatal injuries in Maine when local authorities alleged she crashed her car after getting high on dust remover.[76]

---

[72] *Suit: "Huffing" Teen Driver May Have Run Over Girl Twice*, CBS Chicago (Sep. 20, 2012), https://chicago.cbslocal.com/2012/09/20/suit-huffing-teen-driver-may-have-run-over-girl-5-twice/.

[73] Wood TV8, *Driver on "Duster" Causes 3-Car Crash*, YouTube (Dec. 13, 2012), https://www.youtube.com/watch?v=sDpnX0m7a8E.

[74] ABC 17 News, *21-Year-Old Dies from Inhaling Air Duster Can*, YouTube (Nov. 11, 2014), https://www.youtube.com/watch?v=ePXED7E4-sw&feature=youtu.be.

[75] *Spread of "Huffing" Feared*, The Post Star (June 2, 2014), https://poststar.com/news/local/spread-of-huffing-feared/article_287eac5e-ea9c-11e3-a0bf-001a4bcf887a.html.

[76] Erica Thoms, *Driver in Near-Fatal Belfast Crash Charged with Abuse of Inhalants* (May 14, 2014), https://www.penbaypilot.com/article/driver-near-fatal-belfast-crash-charged-abuse-inhalants/33406.

108.    In 2014, local authorities in Texas charged a man with a felony when he was alleged to have crashed his car after getting high on dust remover, injuring himself and his passenger.[77]

109.    In 2016, researchers published a research article reviewing the death of a person associated with inhaling dust removers.[78]

110.    In 2016, researchers published a research article reviewing the death of another person associated with inhaling dust removers.[79]

111.    In 2017, a driver struck and fatally killed three Minnesota men who were traveling to a cabin for the weekend after the driver huffed Defendants' Ultra Duster product.[80]

112.    A video posted to YouTube.com in 2017 shows a woman sitting in the driver's side of her car immediately after crashing her car and then continuing to huff from a can of dust remover.[81]

---

[77]*MPD: Man Inhales Air Duster, Injures Passenger in Crash*, MRT.com (June 2, 2014), https://www.mrt.com/crime/article/MPD-Man-inhales-air-duster-injures-passenger-in-7411373.php.

[78] S. Kumar et al., *Cardiomyopathy from 1,1-Difluoroethane Inhalation*, Cardiovascular Toxicology 16, 370-73 (Nov. 2015), https://link.springer.com/article/10.1007%2Fs12012-015-9348-5 [abstract].

[79] Alexis L. Cates and Matthew D. Cook, *Severe Cardiomyopathy after Huffing Dust-Off*, Case Reports in Emergency Medicine, vol. 2016, Article ID 9204790 (2016), https://www.hindawi.com/journals/criem/2016/9204790/.

[80] FOX 9, *Impaired, wrong-way driver in court for deaths of three cabin-bound Minnesota men*, (Aug. 9, 2017) https://www.fox9.com/news/impaired-wrong-way-driver-in-court-for-deaths-of-three-cabin-bound-minnesota-men.

[81] @RoadCam, *Woman Inhaling Gas Duster Caused a Crash*, YouTube (Nov. 27, 2017), https://www.youtube.com/watch?v=YJrroAChIW4.

113.    In a particularly disturbing video posted to YouTube.com in 2017, a young man inhales dust remover while sitting in the driver's seat of his truck and parked in a parking lot.  The video demonstrates the immediate, debilitating effects of inhaling dust remover.[82]

114.    In 2019, researchers published a case study of a woman who suffered from acute psychosis after inhaling a dust remover.[83]

115.    In 2019, a Minnesota woman was struck and killed by a driver who had been huffing CRC Duster-branded dust remover.[84]

116.    On May 28, 2020, a Wisconsin man struck and killed an eighteen-year-old girl who was walking after the man lost control of his vehicle when he got high on dust remover.[85]

117.    And in popular culture, dust remover abuse has been portrayed on film and TV and entertainment personalities have fallen victim to the intoxicating and addicting effects of dust removers.

---

[82] @Diamondmytegaming, *Air Duster in a McDonald's Parking Lot*, YouTube (Oct. 2, 2017), https://www.youtube.com/watch?v=Wt-3JF1tgM0.
[83] Clara B. Novotny et al. "Acute Psychosis Following 1,1-Difluoroethane Inhalation," *Cureus* vol. 11(9) e5565 (Sep. 4 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6820689/.
[84] Lakeland PBS, *One Dead After Crash In Lake Of The Woods Count*, (Jul. 23, 2019) https://lptv.org/one-dead-after-crash-in-lake-of-the-woods-county/.
[85] Fox WZAW, *Court docs: Texting was a factor in fatal Adams County hit-and-run,* (May 28, 2020) https://www.wsaw.com/fox/content/news/Court-docs-Texting-huffing-factors-in-fatal-Adams-County-hit-and-run-570840431.html.

118.    In the movie *Thirteen*, released in 2003, two characters are portrayed getting high on dust remover.[86]

119.    On August 11, 2008, in Season 4, Episode 19 of the TV show *Intervention* which follows people who work to overcome—and recover from—their drug addictions, the show focused on a young woman who was addicted to getting high off dust removers.[87]

120.    In Season 14, Episode 7 of the TV show *South Park* that aired on April 28, 2010, the show portrayed one of the characters with a drug addiction and was depicted getting high on dust remover while sitting in a car.[88]

121.    In 2017, Aaron Carter, a popular singer, crashed his car after his friends called 911 multiple times to report Carter had been huffing dust remover all night, Carter had been driving all night, and that Carter was a danger on the road as a result.[89]

122.    On June 23, 2020, Brandon Hall, an actor prominently known for his role in the 1994 movie *Little Rascals,* was arrested for huffing dust remover after local authorities responded to a hotel's call about a possible overdose.[90]

[86] Alexandru Cojanu, *Inhalant Abuse: The Wolf in Sheep's Clothing*, American Journal of Psychiatry Residents' Journal (Feb. 2018), https://psychiatryonline.org/doi/pdf/10.1176/appi.ajp-rj.2018.130203.
[87] A&E, *Intervention: Allison*, S4 E20 (Aug. 11, 2008), https://play.aetv.com/shows/intervention/season-4/episode-19.
[88] @trilabyte700, *Towelie Inhaling 2000 Cans of Computer Air Duster a Day*, YouTube (Feb. 16, 2012), https://www.youtube.com/watch?v=wfXzHDY5Lrc.
[89] *Aaron Carter: "He's Inhaling Computer Duster" Says Friend in 911 Call (Audio)*, TheBlast (Sep. 21, 2017, updated June 10, 2019), https://theblast.com/c/aaron-carter-computer-duster-911-call.
[90] US Weekly, *'Little Rascals' Star Bug Hall Arrested for Allegedly Huffing Air Duster: See the Mugshot*, (Jun. 23, 2020),

## DEFENDANTS' ULTRA DUSTER

123.   Defendants, at all material and relevant times and upon information and belief, designed, manufactured, tested, labeled, distributed, and/or sold a dust remover called Ultra Duster.



124.   At all material and relevant times, the function of Ultra Duster was similar to other dust removers containing DFE on the market.

125.   At all material and relevant times, Defendants advertised and marketed Ultra Duster as a "compressed gas air duster" that "blast[s] dust, dirt, and unwanted micro-articles away from computers, keyboards, printers plus many more."[91]

_____

https://www.usmagazine.com/celebrity-news/news/little-rascals-bug-hall-arrested-for-allegedly-huffing-see-his-mugshot/.

[91] AW Distributing, Inc., *Ultra Duster Product Description,* http://www.awdus.com/products_01_01.html.

126.   At all material and relevant times, the appearance of Ultra Duster was substantially similar to other dust remover products on the market:



127.   At all material and relevant times, the main ingredient in Ultra Duster—like other compressed gas dusters on the market—was DFE:[92]

## SECTION 3.  COMPOSITION/INFORMATION ON INGREDIENTS

| Ingredients | CAS # | % TLV PEL UNITS |
|---|---|---|
| 1,1-Difluoroethane | 75-37-6 | 100 |
| Contains: Bitterant | | |

128.   At all material and relevant times, DFE was the main ingredient in Ultra Duster because the sole purpose of this product is to propel a pressurized burst of gas from the can at a high velocity to displace dust and other material from the surface of whatever item is being cleaned.

---

[92] AW Distributing, Inc., *Ultra Duster Safety Data Sheet,* http://awdus.com/MSDS01.HTML.

129.    At all material and relevant times, the Material Safety Data Sheet that Defendants published online for Ultra Duster acknowledges the severe Central Nervous System effects of inhaling DFE:[93]

**Human Health Effects:**
Contact with the liquid may cause frostbite. Overexposure by inhalation may include nonspecific discomfort, such as nausea, headache, or weakness; or temporary nervous system depression with anesthetic effects such as dizziness, headache, confusion, incoordination and loss of consciousness. Higher exposures (>20%) may cause temporary lung irritation effects with cough, discomfort, difficulty breathing, or shortness of breath; or temporary alteration of the heart's electrical activity with irregular pulse, palpitations, or inadequate circulation, abnormal kidney function as detected by laboratory tests. Gross overexposure may be fatal. Individual with preexisting diseases of the central nervous or cardiovascular system may have increased susceptibility to the toxicity of excessive exposures.

130.    Because the DFE in Ultra Duster causes psychoactive effects when inhaled, many people intentionally inhale Ultra Duster to get high.[94]

131.    At all material and relevant times, Defendants knew that people intentionally inhaled Ultra Duster to get high.

132.    At all material and relevant times, Defendants knew that people intentionally inhaled Ultra Duster to get high while driving and subsequently harm or kill innocent bystanders.

133.    In fact, a civil lawsuit was commenced against multiple defendants—including AW Distributing and Walmart—in 2012 when two Florida residents were seriously injured after being struck by a woman who was high on Ultra Duster dust remover while driving.[95]  A copy of that 2012 Complaint is attached hereto as Exhibit

---

[93]    AW Distributing, Inc., *Ultra Duster Safety Data Sheet,* http://awdus.com/MSDS01.HTML.
[94] National Institute on Drug Abuse, *Inhalants: Letter from the Director,* https://www.drugabuse.gov/publications/research-reports/inhalants/letter-director.
[95] Complaint, *Greico v. Merrill, et. al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Nov. 20, 2012) (attached hereto as Exhibit A); Deposition Transcript of Joe Bussell ("Bussel Dep.") (attached hereto as Exhibit B), *Greico v. Merrill, et. al.*, No. 50-2012-

A.  Joe Bussell testified as the Corporate Representative of Walmart on October 22, 2015.  A copy of his deposition transcript is attached hereto as Exhibit B.  Kennic Ho testified as the Manager of AW Distributing on February 15, 2016.  A copy of his deposition transcript is attached hereto as Exhibit C.

134.  According to Kennic Ho, AW Distributing's Manager, AW Distributing— and Kennic Ho personally—are aware that people inhale Ultra Duster to get high, and that people "abuse[] it":[96]

```
14        Q.      Are you aware that people inhale Ultra Duster
15   to get high?
16                MR. WARING:   Object to the form.
17                THE WITNESS:   I know someone -- I know people
18   abused it.
```

[Remainder of Page Intentionally Blank]

CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015); Deposition Transcript of Kennic Ho ("Ho Dep.") (attached hereto as Exhibit C), *Greico v. Merrill, et. al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Feb. 15, 2016).
[96] Ho Dep. 28:10–18, *Greico v. Merrill, et. al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Feb. 15, 2016).

135.   According to Joe Bussell, Walmart's Corporate Representative, Walmart is also aware that people inhale Ultra Duster to get high, and that people "abuse[] it":[97]

```
 9        Walmart is aware that consumers of canned air
10   purchased in it's stores often buy it to inhale it and get
11   high.  Right?
12               MR. WOOD:  Objection.  Argumentative.
13               MR. SANTIAGO:  Object to the form.
14               MR. WOOD:  Asked answered, and move to
15   strike.
16   A.    Again, Walmart is aware that customers have
17   purchased the product and misused it or abused it, in the
18   past, yes.
```

[Remainder of Page Intentionally Blank]

---

[97] Bussell Dep. 36:9–18, *Greico v. Merrill, et. al.,* No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).

136.   According to Kennic Ho, AW Distributing has known that people intentionally inhale dust remover products containing difluoroethane since before Ultra Duster started being sold: [98]

```
 7              Have you ever heard of anybody inhaling Ultra
 8    Dust?
 9              MR. WARING:  Object to form.
10              THE WITNESS:  Yes.
11    BY MR. KOLTON:
12         Q.   Where did you first hear about that?
13              MR. WARING:  Object to form.
14              THE WITNESS:  I don't remember what year.
15    BY MR. KOLTON:
16         Q.   Was it before Ultra Duster started being sold?
17              MR. WARING:  Object to form.
18              THE WITNESS:  Maybe.
19              Probably, yes.
```

[Remainder of Page Intentionally Blank]

---

[98] Ho Dep. 29:7–19, *Greico v. Merrill, et. al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Feb. 15, 2016).

137.    In fact, Kennic Ho testified under oath that he was aware that people misused and abused Ultra Duster since at least May 2010: [99]

```
 5          Q.    What type of misuse and abuse were you hoping
 6    to impact?
 7                MR. WARING:  Object to form.
 8                THE WITNESS:  Other than legal uses, all kind
 9    of different -- all kind of other uses are abuse.
10    BY MR. KOLTON:
11          Q.    Would that include inhalation of Ultra Duster?
12                MR. WARING:  Object to form.
13                THE WITNESS:  Of course.
14    BY MR. KOLTON:
15          Q.    So you knew that people inhaled Ultra Duster
16    back in May of 2010?
17                MR. WARING:  Object to form.
18                THE WITNESS:  Can you repeat timeframe,
19    please.
20    BY MR. KOLTON:
21          Q.    Sure.
22                Back in May 2010, when you wrote this E-mail,
23    you knew that people inhaled computer duster products
24    such as Ultra Duster?
25          A.    Yes.
```

---

[99] Ho Dep. 104:5–25, *Greico v. Merrill, et. al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Feb. 15, 2016).

138.   Joe Bussell similarly testified under oath that Walmart was aware that people have been misusing and abusing Ultra Duster since at least 2008: [100]

```
11   Q.    So Walmart was aware people were actually huffing in
12   their stores and passing out in 2008; right?
13   A.    Yes.  Again, those types of incidents are what led
14   us to request that there was a bittering agent in the
15   products.
```

139.   Walmart Knows that people have misused and abused Ultra Duster and similar dust removers in Walmart stores and parking lots: [101]

```
12   Q.    (Mr. Cornwell continued.)  Well, let me read it into
13   the record.  "Deputies say Jones huffed an aerosol
14   computer cleaner for several hours before the car he was
15   driving struck Starnes in a crosswalk, then hit a parked
16   truck and a tree."  Do you see that?
17   A.    Yes.
18   Q.    It goes on to say that "huffing led Jones to lose
19   consciousness, which he didn't regain until the air bag
20   deployed, deputies said."  Okay?
21   A.    It says that, yes.
22   Q.    Yeah.  Is this an incident that Walmart would be
23   aware of since it occurred in their parking lot?
24   A.    Our asset protection team would be aware of it since
25   it occurred in the parking lot, yes.
```

_____

[100] Bussell Dep. 148:11–15, *Greico v. Merrill, et. al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).

[101] Bussell Dep. 121:12–25, *Greico v. Merrill, et. al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).  *See also id.* at 116:11–117:6, 120:16–121:21, 125:15–126:9, 144:5–17, 147:2–13, 149:3–25, 151:24–153:10, 155:6–156:3, 157:15–158:1, 159:16–160:23, 161:1–12, 162:22–163:13, 166:14–23, 176:25–177:9, 178:23–179:10, 186:13–187:1, 193:6–24, 199:25–200:15, 201:3–18, 202:4–16, 203:3–204:2, and 204:13–23.

140.   At all material and relevant times, the product label for Ultra Duster contained a general notice to the user of the product that "misuse by deliberately concentrating and inhaling contents may be harmful or fatal":



141.   At all material and relevant times, AW Distributing published a website http://www.ultraduster.com/ ("Ultra Duster Website") which states "ULTRA DUSTER contains a bitterant additive that discourages potential abusive and misusage of the product by making its contents unpleasant to inhale." [102]

142.   At all material and relevant times, the Ultra Duster Website published a notice that Ultra Duster "now comes with an additive known as bitterant, making the contents extremely unpleasant to inhale." The informational notice contains a

---

[102] Ultra Duster, *Bitterant*, http://www.ultraduster.com/bitterant.html.

website link to provide users and potential users of Ultra Duster information on inhalant abuse at https://inhalant-abuse.net/:[103]



143.     At all material and relevant times, the Ultra Duster Bitterant Webpage only advised visitors of the website of the potential for inhalant abuse.

144.     At all material and relevant times, the Ultra Duster Bitterant Webpage provided no warnings that inhaling Ultra Duster can cause harm or death to innocent bystanders, including the foreseeable and predictable risk that a person could lose control of their vehicle and strike and injure or kill another person when high on Ultra Duster.

145.     At all material and relevant times, Defendants provided inadequate warnings to the user of the product about the potential for harm that the user may experience as a result of inhaling Ultra Duster.

146.     At all material and relevant times, Defendants provided no warnings that inhaling Ultra Duster can cause harm or death to innocent bystanders, including the foreseeable and predictable risk that a person could lose control of their vehicle and strike and injure or kill another person when high on Ultra Duster.[104]

---

[103] Ultra Duster, *Bitterant*, http://www.ultraduster.com/bitterant.html.
[104] AW Distributing, Inc., *Website generally*, http://www.awdus.com/

147.   At all material and relevant times, and upon information and belief, Defendants never warned people who are, or who could be, exposed to Ultra Duster that they should not operate a motor vehicle.[105]

148.   According to Kennic Ho, a bitterant ("bitterant" or "bittering agent") has been present in Ultra Duster since Ultra Duster was first distributed in the United States: [106]

```
 9       Q.     Did Wal-Mart ever direct AW Distributing to
10    add a bitterant to Ultra Duster?
11       A.     If I didn't remember wrong, our product from
12    the first day that it was imported to America already
13    have bitterant added to it.
```

149.   At all material and relevant times, the product label for Ultra Duster advertised that Ultra Duster "[c]ontains a bitterant to help discourage inhalant abuse":[107]



---

[105] AW Distributing, Inc., *Website generally,* http://www.awdus.com/
[106] Ho Dep. 104:5–25, *Greico v. Merrill, et. al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Feb. 15, 2016).
[107] Sam's Club, *Ultra Duster Label,* https://www.samsclub.com/p/ultra-duster-compressed-gas-4pk-canned-air/prod22700731

150.    The advertised bittering agent, in fact, did not effectively discourage or prevent people from getting inhaling Ultra Duster to get high.

151.    At all material and relevant times and upon information and belief, Defendants had no intention of actually discouraging abuse of Ultra Duster as an inhalant as Defendants continued to sell Ultra Duster in a form that continued to be inhaled by persons seeking to get high.

152.    At all material and relevant times and upon information and belief, Defendants only advertised the existence of a "bittering agent" because certain retailers, such as Walmart, would not sell the product without such an advertisement on the label.

153.    According to Joe Bussell, Walmart required AW Distributing "to include a bitterant in their [Ultra Duster] supplied to Walmart": [108]

```
3   Q.    So -- and my question was poor.  Let me back up.
4   Beginning in 2011, Walmart required all suppliers of
5   canned air, including AWD, to include a bitterant in their
6   canned air product supplied to Walmart.
7   A.    Correct.
```

[Remainder of Page Intentionally Blank]

---

[108] Bussell Dep. 220:3–7, *Greico v. Merrill, et. al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).

154.   At all material and relevant times and upon information and belief, certain retailers, such as Walmart, required Defendants to advertise the existence of a "bittering agent" on their Ultra Duster label in response to known incidents of dust remover abuse.

155.   However, at all material and relevant times, the "bittering agent" that Defendants advertised as an ingredient added to "discourage inhalant abuse," in fact, did not work for its intended or advertised purpose.

156.   Or worse, reasonable further investigation and discovery may show that Ultra Duster did not contain a bittering agent whatsoever.

157.   And upon information and belief, none of the Defendants conducted any testing or otherwise took any reasonable efforts to ensure the bittering agent they claim is present actually worked to deter or discourage abuse of the Ultra Duster product.

[Remainder of Page Intentionally Blank]

158.    According to Kennic Ho, AW Distributing did not even specifically request that Ultra Duster be tested to ensure a "bittering agent" was released from the product: [109]

```
20              What was your request -- specific request to
21    the testing company?
22              MR. WARING:  Object to form.
23              THE WITNESS:  To test inside the can, if there
24    is what I wanted inside.
25    BY MR. KOLTON:
```

```
1        Q.      So you tested to make sure that what you
2    wanted was inside the can, but you didn't specifically
3    ask them to test to make sure that it came out of the
4    can?
5              MR. WARING:  Object to form.
6              THE WITNESS:  I mean, if you're able to put it
7    inside, it got to be able to come outside.
```

[Remainder of Page Intentionally Blank]

---

[109] Ho Dep. 114:20–7, *Greico v. Merrill, et. al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Feb. 15, 2016).

159.   Similarly, according to Joe Bussell, Walmart did not require that Ultra Duster be tested to ensure a "bittering agent" was actually released from the product:[110]

```
 7        Are you aware that Walmart did not require AWD to
 8   demonstrate that bitterant actually comes out of the can?
 9   A.   I'm not even aware how they would demonstrate that,
10   so, no, we wouldn't require that.
```

160.   In fact, according to Joe Bussell, Walmart had not seen any research or data that showed whether Ultra Duster released a "bittering agent" when Ultra Duster was sprayed:[111]

```
 1   Q.    Well, have you seen the research or data that shows
 2   that none of the bitterant comes out of the can when you
 3   spray the product called Ultra Duster?
 4            MR. WOOD:  Same objection.
 5   A.    Related to --
 6            MR. WARING:  Object to form.
 7            MR. SANTIAGO:  Join.
 8   A.    I have not seen that, no.
```

[Remainder of Page Intentionally Blank]

---

[110] Bussell Dep. 139:7–10, *Greico v. Merrill, et. al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).
[111] Bussell Dep. 43:1–8, *Greico v. Merrill, et. al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).

161.   Moreover, according to Joe Bussell, Walmart was not aware of any data that showed whether the "bittering agent" was even effective: [112]

```
 3   So the question is yes or no.  Either you have seen data
 4   research studies or something that indicates to you that
 5   bitterant has some effect on the inhalation of canned air,
 6   or you haven't.  And you've not seen any such study, have
 7   you?
 8              MR. WOOD:  Objection.  Move to strike.
 9              MR. SANTIAGO:  Object to form.
10   A.    The answer is no, because I would have no reason to.
```

162.   At all material and relevant times, people continued to abuse Ultra Duster in order to get high despite the advertised "bittering agent," including Tyler Harmon.

163.   At all material and relevant times, Defendants knew or should have known that people continued to abuse Ultra Duster to get high, despite advertising to the public that Ultra Duster contained a bittering agent to help discourage inhalant abuse.


[Remainder of Page Intentionally Blank]


---

[112] Bussell Dep. 41:3–10, *Greico v. Merrill, et. al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).

164.   According to Joe Bussell, Walmart was aware that people continued to abuse Ultra Duster despite the advertised "bittering agent" since at least 2012: [113]

```
 5          Walmart was well aware in 2012 after it had required
 6     a bitterant to be put in canned air products, that people
 7     continued to buy it and inhale it; right?
 8     A.     Walmart was aware that these incidents occurred.
 9     Q.     Continued to occur; right?
10     A.     Again, Walmart is aware that these incidents have
11     occurred.  As far as continuing to occur or how often they
12     do, I'm not sure what that is.
```

165.   According to Joe Bussell, Walmart was aware that people continued to abuse Ultra Duster in Walmart stores and Walmart parking lots: [114]

```
 3     Q.     (Mr. Cornwell continued.)  Walmart was also aware of
 4     hundreds of incidents involving individuals inhaling Ultra
 5     Duster on store property, in the store parking lot,
 6     driving vehicles, crashing cars, killing themselves, and
 7     killing others, in 2012, wasn't it?
 8            MR. WOOD:  Same objection.
 9     A.     Again, I don't know the specific nature of the
10     complaints.  Walmart was aware that there were incidents
11     involving people inhaling this product, and that's why
12     Walmart engaged with the suppliers to determine what sort
13     of action could be taken to deter that type of activity.
```

---

[113] Bussell Dep. 74:5–12, *Greico v. Merrill, et. al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).
[114] Bussell Dep. 54:3–13, *Greico v. Merrill, et. al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).

166.   At all material and relevant times, Defendants knew or should have known that the advertised "bittering agent" did not effectively discourage abuse of Ultra Duster as an inhalant.

167.   Even if Defendants successfully incorporated a "bittering agent" into Ultra Duster's formulation, the physiological effects of inhaling a "bittering agent" mixed with DFE could potentially cause bronchial smooth muscle relaxation, thereby increasing DFE absorption in the body and increasing Ultra Duster's intoxicating effects.[115]

168.   At all material and relevant times, Ultra Duster was sold in quantities far greater than what would be expected if used only for its intended use.

169.   At all material and relevant times, Defendants knew or should have known that Ultra Duster was being sold in quantities far greater than what would be expected if used only for its intended use.

170.   At all material and relevant times, Defendants knew or should have known that Ultra Duster was being sold in quantities far greater than what would

---

[115] *See, e.g.,* Deshpande DA, Wang WCH, Mcilmoyle EL, Robinett KS, Schillinger RM, An SS, *et al. Bitter taste receptors on airway smooth muscle bronchodilate by localized calcium signaling and reverse obstruction.* NAT MED N Y (2010), 16:1299–304, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3066567/; Clifford RL, Knox AJ. *Future bronchodilator therapy: a bitter pill to swallow?* AM J PHYSIOL-LUNG CELL MOL PHYSIOL (2012), 303:L953–5, *available at* https://journals.physiology.org/doi/full/10.1152/ajplung.00303.2012; Liggett SB. *Bitter taste receptors on airway smooth muscle as targets for novel bronchodilators.* EXPERT OPIN THER TARGETS (2013), 17:721–31 *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4437536/.

be expected if used only for its intended use because people were purchasing Ultra Duster to get high.

171. At all material and relevant times, Defendants knew or should have known that a large portion of their sales of Ultra Duster were to people who purchased the product to get high.

172. At all material and relevant times, Defendants knew or should have known that persons were using Ultra Duster in a manner that resulted in death and injury to innocent bystanders in motor vehicle crashes.

173. At all material and relevant times, Defendants placed Ultra Duster into the stream of commerce, including within the State of Minnesota, despite knowing of the foreseeable misuse of Ultra Duster as an inhalant.

174. At all material and relevant times, Defendants placed Ultra Duster into the stream of commerce, including within the State of Minnesota, despite knowledge of the foreseeable misuse of Ultra Duster as an inhalant, and that this foreseeable use would cause harm to innocent bystanders, including in motor vehicle crashes.

175. At all material and relevant times, Defendants provided false and misleading warnings, labels, promotions, marketing, and information and failed to provide adequate warning of the risks and dangers associated with the foreseeable misuse of Ultra Duster that might befall not just the person inhaling Ultra Duster, but innocent bystanders in motor vehicle crashes as well.

176. At all material and relevant times, Defendants failed to provide adequate warning of the risks and dangers associated with the foreseeable misuse of

Ultra Duster that might befall not just the person inhaling Ultra Duster, but innocent bystanders in motor vehicle crashes as well.

177. Reasonable further investigation and discovery may show that at all material and relevant times, Defendants falsely claimed that Ultra Duster contained a bittering agent that would deter inhalant abuse, when in fact Ultra Duster contained no such bittering agent.

178. At all material and relevant times, Defendants falsely claimed that Ultra Duster contained a bittering agent that would deter inhalant abuse, when in fact the "bittering agent" was completely ineffective.

179. At all material and relevant times, Defendants failed to add a "bittering agent" or other product to Ultra Duster that effectively deterred inhalant abuse.

180. At all material and relevant times, people predictably and foreseeably continued to use Ultra Duster to get high, drive while high on Ultra Duster, lose control of their vehicles, and injure or kill innocent bystanders, including Natalie Chairez and Samantha Chairez.

181. At all times relevant, Defendants negligently and maliciously and wantonly and willfully disregarded the rights and safety of the public, including Natalie Chairez and Samantha Chairez, because they placed their dust remover products containing difluoroethane—such as Ultra Duster—into the stream of commerce, including within the State of Minnesota, despite knowledge that people will continue to use Ultra Duster to get high, drive while high on Ultra Duster, lose

control of their vehicles, and injure or kill innocent bystanders, including Natalie Chairez and Samantha Chairez.

### NATALIE CHAIREZ AND SAMANTHA CHAIREZ'S CATASTROPHIC INJURIES

182.   On December 17, 2017, Tyler Harmon was driving his vehicle in Sherburne County, State of Minnesota.

183.   While driving, Harmon huffed a can of dust remover.

184.   The dust remover that Harmon inhaled was Ultra Duster, which was retrieved from by the Minnesota State Patrol after the near-fatal crash:



185.   Harmon got high from intentionally huffing Ultra Duster.

186.   Harmon got high from huffing Ultra Duster despite the advertised presence of a bittering agent in the product.

187.   Harmon lost consciousness and/or all control of his bodily movements when he was high on Ultra Duster.

188.   Harmon lost the ability to drive and the ability to maintain control of his vehicle when he was high on Ultra Duster.

189.   Because Harmon predictably and foreseeably huffed Ultra Duster, got high, lost consciousness and/or all control of his bodily movements, and lost the ability to maintain control of his vehicle, he predictably and foreseeably crossed over the median and drove on the opposite side of the highway into oncoming traffic, where his vehicle struck Natalie Chairez and her daughter Samantha Chairez, both of whom who were lawfully driving in their own vehicle. The collision severely injured Natalie Chairez's and Samantha Chairez's body and mind.

## FIRST CAUSE OF ACTION

### (As to All Plaintiffs and Defendants)
### Strict Products Liability – Defective Design

190.   Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

191.   At all material and relevant times, the Ultra Duster product at issue in this case was misused in a reasonably foreseeable manner.

192.   At all material and relevant times, Natalie Chairez and Samantha Chairez's injuries were reasonably foreseeable.

193.   At all material and relevant times, Natalie Chairez and Samantha Chairez's injuries were a reasonably foreseeable result of Ultra Duster's defective design.

194.    At all material and relevant times, safer, technologically feasible, and practical alternative designs were, have been, and are available to Defendants that would have prevented Natalie Chairez and Samantha Chairez's injuries, without substantially impairing the reasonably anticipated and/or intended function of Ultra Duster.

195.    At all material and relevant times, safer, technologically feasible, and practical alternative designs were, have been, and are available to Defendants that would have prevented Natalie Chairez and Samantha Chairez's injuries, without rendering Ultra Duster too expensive for it to be reasonably marketable.

196.    At all material and relevant times, the risk of harm caused by Ultra Duster's defective design has outweighed and continues to outweigh its utility.

197.    At all material and relevant times, safer designs for Ultra Duster were available to Defendants that were practicable, feasible, and/or otherwise reasonable alternative designs and/or formulations that would have prevented or substantially reduced the risk of injury, harm, and death to innocent bystanders in motor vehicle crashes.

198.    At all material and relevant times, safer, technologically feasible, and practical alternative designs were, have been, and are available to Defendants that would have reduced and/or prevented foreseeable misuse of Ultra Duster.

199.    Reasonable, safer alternative designs of Ultra Duster, include, but are not limited to, modifications in the packaging of Ultra Duster, including a modification so that less DFE can be released during each spray.

200.    Reasonable, safer alternative designs of Ultra Duster, include, but are not limited to, modifications in the formulation, and/or amount, and/or inclusion altogether of the propellant, DFE, found in Ultra Duster.

201.    Reasonable, safer alternative designs of Ultra Duster, include, but are not limited to, modifications in the formulation, and/or amount, and/or inclusion altogether of Ultra Duster's "bittering agent."

202.    Reasonable, safer alternative designs of Ultra Duster, include, but are not limited to, providing adequate warnings and instructions on the Ultra Duster product packaging.

203.    Multiple safer, feasible alternative designs of Ultra Duster were, have been, and are available to Defendants, yet, Defendants have marketed and sold, and continues to market and sell, Ultra Duster, a defectively designed and unreasonably dangerous product.

204.    At all material and relevant times, it was reasonably foreseeable that Natalie Chairez and Samantha Chairez could be injured and/or killed as a result of the design defects of the Ultra Duster product at issue in this case.

205.    The design defect or defects concerning the Ultra Duster at issue in this case were a substantial, direct, and proximate cause of Natalie Chairez and Samantha Chairez's injuries.

## SECOND CAUSE OF ACTION

## (As to All Plaintiffs and Defendants)

## Strict Products Liability –Manufacturing Defect

206.   Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

207.   At all material and relevant times, the Ultra Duster product at issue in this case was in substantially the same condition as it was when it left Defendants' control.

208.   At all material and relevant times, the Ultra Duster product at issue in this case was not altered in any way since the time it left Defendants' control.

209.   At all material and relevant times, the Ultra Duster product at issue in this case contained a manufacturing defect and was not reasonably fit, suitable or safe.

210.   At all material and relevant times, the Ultra Duster product at issue in this case deviated from the design specifications, formulae, and performance standards of Defendants' Ultra Duster.

211.   At all material and relevant times, the Ultra Duster product at issue in this case was manufactured differently than the same product as manufactured according to Defendants' manufacturing standards.

212.   At all material and relevant times, concerning the Ultra Duster product at issue in this case, the "bittering agent" that Defendants advertised as an ingredient

added to Ultra Duster to deter "inhalant abuse," did not work for its intended or advertised purpose.

213.   At all material and relevant times, Defendants have advertised that their "bittering agent," and/or formulation deters abuse.  Because the Ultra Duster can in this case was abused, a manufacturing defect apparently existed in the Ultra Duster product at issue in this case, as it was unable to deter abuse.

214.   Reasonable further investigation and discovery may show that the Ultra Duster product at issue in this case did not contain a "bittering agent" whatsoever.

215.   Upon information and belief, reasonable investigation and discovery may show that some cans of Ultra Duster manufactured by Defendants contain a "bittering agent" and some cans do not, although Defendants' design specifications and performance standards mandate that all Ultra Duster cans contain a "bittering agent."

216.   Upon information and belief, reasonable investigation and discovery may show that, concerning the Ultra Duster product at issue in this case, the "bittering agent" did not uniformly mix with the DFE, and, thus, the "bittering agent" simply rested inside the can and did not escape the can along with DFE when the can was sprayed.

217.   At all material and relevant times, it was reasonably foreseeable that Natalie Chairez and Samantha Chairez could be injured and/or killed as a result of the manufacturing defect or defects of the Ultra Duster product at issue in this case.

218.    At all material and relevant times, the manufacturing defect or defects concerning the Ultra Duster product at issue in this case were a substantial, direct, and proximate cause of Natalie Chairez's and Samantha Chairez's injuries.

## THIRD CAUSE OF ACTION

### (As to All Plaintiffs and Defendants)

### Strict Products Liability – Failure to Warn

219.    Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

220.    At all material and relevant times, Defendants failed to provide an adequate warning on the Ultra Duster product at issue in this case.

221.    At all material and relevant times, Defendants knew or should have known that drivers impaired by inhaling Ultra Duster have injured bystanders in motor vehicle crashes.

222.    At all material and relevant times, Defendants knew or should have known that a driver misusing Ultra Duster could cause injury, harm, and/or death to innocent bystanders in motor vehicle crashes.

223.    At all material and relevant times, Defendants did not act as reasonably prudent manufacturers, distributors, or sellers because reasonably prudent manufacturers, distributors, and sellers would have kept reasonably familiar with news events and stories, scientific studies, and other reliable information concerning the foreseeable misuse of Ultra Duster while driving, which has caused injury, harm, and death to innocent bystanders in motor vehicle crashes, and reasonably prudent

manufacturers, distributors, and sellers would have enhanced their warning based on this information.

224.   At all material and relevant times, Defendants provided false and misleading warnings, labels, promotions, marketing, and information about the deterrent effect of Ultra Duster's "bittering agent."

225.   At all material and relevant times, Defendants did not provide any warning on the Ultra Duster product at issue in this case concerning the risks and dangers associated with the foreseeable misuse of Ultra Duster, including, the risks and dangers of causing injury, harm, and/or death to innocent bystanders in motor vehicle crashes.

226.   At all material and relevant times, Defendants failed to provide adequate warnings and/or instructions to others in the chain of distribution about the risks and dangers associated with the foreseeable misuse of Ultra Duster, including the risks and dangers of causing injury, harm, and death to innocent bystanders in motor vehicle crashes.

227.   At all material and relevant times, Defendants failed to provide adequate warnings and/or instructions about the risks and dangers associated with the foreseeable misuse of Ultra Duster that might befall not just the person inhaling Ultra Duster, but might injure innocent bystanders in motor vehicle crashes. Defendants failed to convey this information to distributors and/or retailers of Ultra Duster, as well as to foreseeable misusers of Ultra Duster, regulatory authorities, law enforcement authorities, legislative authorities, news organizations, and/or any other

relevant service or organization that could implement restrictions concerning the improper use and/or sale of Ultra Duster.

228.   At all material and relevant times, had Defendants provided adequate warnings or instructions about the risks and dangers associated with the foreseeable misuse of Ultra Duster, including, warnings concerning the risks and dangers of causing injury, harm, and/or death to innocent bystanders in motor vehicle crashes, that warning would have been heeded by the Ultra Duster misuser involved in the motor vehicle crash that injured and/or killed Natalie Chairez and Samantha Chairez.

229.   At all material and relevant times, Defendants' failure to provide adequate warnings to the foreseeable misuser of the Ultra Duster product at issue in this case was a substantial, direct, and proximate cause of Natalie Chairez and Samantha Chairez's injuries.

## FOURTH CAUSE OF ACTION

### (As to All Plaintiffs and Defendants)

### Negligence

230.   Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

231.   At all material and relevant times, Defendants had a duty to exercise reasonable care in the design, research, formulation, manufacture, production, marketing, testing, supply, promotion, packaging, sale, distribution and/or monitoring of Ultra Duster, including, a duty to assure that the product would not cause foreseeable injuries through foreseeable misuse.

232.   At all material and relevant times, Defendants owed a duty to exercise reasonable care in providing reasonable and adequate warnings of the risks and dangers associated with the foreseeable misuses of Ultra Duster, including the risk and danger of injury, harm, and death to innocent bystanders, such as Natalie Chairez and Samantha Chairez, caused by the foreseeable misuse of Ultra Duster as an inhalant while driving.

233.   At all material and relevant times, Defendants breached their duty when they failed to exercise reasonable care in the designing, testing, producing, processing, assembling, formulating, inspecting, researching, promoting, labeling, marketing, advertising, distributing, and selling of Ultra Duster in that they:

a.   Failed to use due care in the designing, manufacturing, and/or distributing of Ultra Duster to avoid the foreseeable risk of injury, harm, and death to innocent bystanders caused by the foreseeable misuse of Ultra Duster as an inhalant while driving.

b.   Failed to use due care in providing reasonable and adequate warnings of the risks and dangers associated with the foreseeable misuses of Ultra Duster, including the risk and danger of injury, harm, and death to innocent bystanders caused by the foreseeable misuse of Ultra Duster as an inhalant while driving.

234.   As a direct and proximate result of Defendants' carelessness, negligence, and of their design, manufacture, sale and distribution of an unreasonably dangerous product, Natalie Chairez and Samantha Chairez have suffered, and in the future will

suffer permanent and substantial losses, harms and damages, as more fully described herein.

## FIFTH CAUSE OF ACTION

### (As to All Plaintiffs and Defendants)

### Breach of Express Warranty

235.   Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

236.   At all material and relevant times, Defendants expressly warranted that Ultra Duster was safe, of merchantable quality, and adequately fit for use.

237.   At all material and relevant times, Defendants made these warranties through their website, product labeling, product descriptions, and promises, including publicly made written and verbal assurances of safety, that was intended to create a demand for Ultra Duster.

238.   At all material and relevant times, Defendants breached various express warranties including, that Ultra Duster, contained a "bitterant to help discourage inhalant abuse," and made the "contents [of Ultra Duster] extremely unpleasant to inhale."

239.   At all material and relevant times, Ultra Duster did not conform to Defendants' express warranties because it contained a manufacturing defect and was not reasonably fit, suitable or safe. The "bittering agent" that Defendants advertised as an ingredient added to Ultra Duster to deter "inhalant abuse," in fact, did not work for its intended or advertised purpose. Defendants failed to design and manufacture Ultra Duster in a manner such that the "bittering agent" or another product

63

effectively deterred inhalant abuse, so as to avoid the foreseeable risk of injury, harm, and death to innocent bystanders in motor vehicle crashes.

240.   At all material and relevant times, Ultra Duster did not conform to Defendants' express warranties because it was defective in design or formulation in that, when it left the hands of Defendants, it was in an unreasonably dangerous and defective condition as designed, and posed a foreseeable risk of injury, harm, and death to innocent bystanders in motor vehicle crashes.

241.   At all material and relevant times, people predictably and foreseeably relied on Defendants' false and misleading warnings, labels, promotions, marketing, and information about the risks and dangers associated with the foreseeable misuse of Ultra Duster that might befall not just the person inhaling Ultra Duster, but innocent bystanders in motor vehicle crashes as well.

242.   At all material and relevant times, people predictably and foreseeably continued to use Ultra Duster to get high, drive while high on Ultra Duster, lose control of their vehicles, and injure or kill innocent bystanders, including Natalie Chairez and Samantha Chairez.

243.   Natalie Chairez and Samantha Chairez could not have discovered the breached warranties and realized Ultra Duster's danger.

244.   At all material and relevant times, Defendants breached their express warranties, including under Minn. Stat. § 336.2-313, because Ultra Duster was not safe, of merchantable quality, or adequately fit for use.

245.   As a direct and proximate result of Defendants' actions, omissions, and misrepresentations, Natalie Chairez and Samantha Chairez have suffered, and in the future will suffer permanent and substantial losses, harms and damages, as more fully described herein.

**SIXTH CAUSE OF ACTION**

**(As to All Plaintiffs and Defendants)**

**Breach of Implied Warranty**

246.   Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

247.   At all material and relevant times, Defendants designed, manufactured, distributed, advertised, promoted, and sold Ultra Duster.

248.   At all material and relevant times, Defendants impliedly warranted that Ultra Duster was safe, of merchantable quality, and adequately fit for foreseeable use.

249.   At all material and relevant times, Defendants were aware that consumers, including Harmon, would intentionally inhale the Ultra Duster for its intoxicating effects while driving.

250.   At all material and relevant times, consumers and the public, including Natalie Chairez, Samantha Chairez, and Harmon reasonably relied upon the judgment and sensibility of Defendants to sell Ultra Duster only if it was indeed of merchantable quality and safe and fit for its foreseeable uses.

251.   At all material and relevant times, Defendants breached their implied warranties, including under Minn. Stats. §§ 336.2-314 and 336.2-315, to consumers

and the public, including Natalie Chairez, Samantha Chairez, and Harmon, because the Ultra Duster was not of merchantable quality or safe and fit for its intended use.

252.   At all material and relevant times, consumers and the public, including Natalie Chairez, Samantha Chairez, and Harmon, reasonably relied upon Defendants' implied warranties for Ultra Duster.

253.   At all material and relevant times, consumers and the public, including Natalie Chairez and Samantha Chairez, by the use of reasonable care, would not have discovered the breached warranty and realized Ultra Duster's danger.

254.   As a direct and proximate result of Defendants' actions, omissions, and misrepresentations, Natalie Chairez and Samantha Chairez have suffered, and in the future will suffer permanent and substantial losses, harms and damages, as more fully described herein.

## SEVENTH CAUSE OF ACTION

### (As to All Plaintiffs and Defendants)

### Unlawful Trade Practices, Deceptive Trade Practices, False Statement in Advertising, and Unlawful Practices Acts

255.   Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

256.   Plaintiffs bring these claims pursuant to Minn. Stat. §§ 8.31, subd. 3a, 325D.13, 325D.44, 325F.67, and 325F.69.

257.   At all material and relevant times, Defendants knew or should have known that people were using Ultra Duster in a manner that resulted in death and injury to innocent bystanders in motor vehicle crashes.

258.    At all material and relevant times, Defendants placed Ultra Duster into the stream of commerce, including within the State of Minnesota, despite knowledge of the foreseeable misuse of Ultra Duster as an inhalant, and that this foreseeable use would cause harm to innocent bystanders, including in motor vehicle crashes.

259.    At all material and relevant times, Defendants engaged in deceptive, unconscionable, unfair and misleading commercial practices in the marketing and sale of Ultra Duster that Defendants knew to be defective.

260.    At all material and relevant times, Defendants provided false and misleading warnings, labels, promotions, marketing, and information about the risks and dangers associated with the foreseeable misuse of Ultra Duster that might befall not just the person inhaling Ultra Duster, but innocent bystanders in motor vehicle crashes as well.

261.    At all material and relevant times, Defendants induced people to use Ultra Duster in a manner that resulted in death and injury to innocent bystanders in motor vehicle crashes, with the intent that they rely thereon in connection with the sale or advertisement of Ultra Duster through the use of deception, fraud, false advertising, false pretenses, misrepresentations, unfair and/or deceptive practices and the concealment and suppression of material facts, including but not limited to fraudulent statements, concealments and misrepresentations identified herein and above.

262.    As a direct and proximate result of Defendants' carelessness and negligence, and of their design, manufacture, distribution and sale of an

unreasonably dangerous product, Natalie Chairez and Samantha Chairez have suffered, and in the future will suffer permanent and substantial losses, harms and damages, as more fully described herein.

## EIGHTH CAUSE OF ACTION

### (As to All Plaintiffs and Defendants)

### Public Nuisance

263.   Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

264.   At all material and relevant times, Defendants knew or should have known that people continued to abuse Ultra Duster in order to get high despite the advertised "bittering agent."

265.   At all material and relevant times, Defendants knew or should have known that people were using Ultra Duster in a manner that resulted in death and injury to innocent bystanders in motor vehicle crashes.

266.   At all material and relevant times, Defendants engaged in deceptive, unconscionable, unfair and misleading commercial practices in the marketing and sale of Ultra Duster that Defendants knew to be defective.

267.   At all material and relevant times, Defendants provided false and misleading warnings, labels, promotions, marketing, and information about the risks and dangers associated with the foreseeable misuse of Ultra Duster that might befall not just the person inhaling Ultra Duster, but innocent bystanders in motor vehicle crashes as well.

268.   At all material and relevant times, Defendants induced people to use Ultra Duster in a manner that resulted in death and injury to innocent bystanders in motor vehicle crashes, with the intent that people rely thereon in connection with the sale or advertisement of Ultra Duster through the use of deception, fraud, false advertising, false pretenses, misrepresentations, unfair and/or deceptive practices and the concealment and suppression of material facts, including but not limited to fraudulent statements, concealments and misrepresentations identified herein and above.

269.   At all material and relevant times, Defendants' actions and omissions have created a public nuisance.  Defendants' carelessness, negligence, recklessness, deception, and concealment constitutes an unreasonable interference with the exercise of the common rights of the health, safety, and welfare to the citizens of Minnesota, and has maintained or permitted a condition which unreasonably endangers the safety and health of the members of the general public in Minnesota, including, but not limited to innocent bystanders in motor vehicle crashes.

270.   Defendants' failure to inform the public about the risks and dangers associated with the foreseeable misuse of Ultra Duster, and failure to disclose that Ultra Duster lacked the "bittering agent" to deter inhalant abuse, has prevented the public from knowing of a real danger, and has thereby endangered the safety and health of the members of the general public by allowing more people to continue to inhale and abuse Ultra Duster, resulting in an increased risk and danger of injury, harm, and death to innocent bystanders in motor vehicle crashes.

69

271.   Defendants' carelessness, negligence, recklessness, deception, and concealment is of a constant and continuing nature.   Defendants' actions and omissions will undoubtedly continue to cause long-lasting effects on members of the general public in Minnesota, including, but not limited to innocent bystanders in motor vehicle crashes.

272.   Defendants' carelessness, negligence, recklessness, deception, and concealment was specially injurious to Natalie Chairez's and Samantha Chairez's health and personal enjoyment of life as Natalie Chairez and Samantha Chairez were fatally killed by a driver who inhaled and abused Ultra Duster.

273.   Defendants' carelessness, negligence, recklessness, deception, and concealment was specially injurious to Natalie Chairez and Samantha Chairez and their personal enjoyment of life in that when Natalie Chairez and Samantha Chairez finally discovered Defendants' carelessness, negligence, recklessness, deception, and concealment, Natalie Chairez and Samantha Chairez experienced mental and emotional anguish because Natalie Chairez and Samantha Chairez had been the victims of Defendants' carelessness, negligence, recklessness, deception, and concealment.

274.   At all material and relevant times, the foreseeable risks of injury, harm, and death to innocent bystanders in motor vehicle crashes due to Ultra Duster far outweighed the benefits associated with Ultra Duster.

275.   Defendants' design, manufacture, marketing, distribution, and sale of Ultra Duster, if unabated, will continue to cause an unreasonable interference with

public rights of the members of the general public in Minnesota, including, but not limited to innocent bystanders in motor vehicle crashes.

276.    As a direct and proximate result of Defendants' carelessness, negligence, recklessness, deception, and concealment, and of their design, manufacture, distribution, and sale of an unreasonably dangerous product, Natalie Chairez and Samantha Chairez have suffered, and in the future will suffer permanent and substantial losses, harms and damages, as more fully described herein.

## DAMAGES

277.    Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

278.    As a direct and proximate result of Defendants' carelessness, negligence, recklessness, deception, concealment, and violation of Minn. Stat. §§ 325D.13, 325D.44, 325F.67, and 325F.69, and of their design, manufacture, distribution, and sale of an unreasonably dangerous product, Natalie Chairez and Samantha Chairez have suffered, and in the future will suffer great pain of body and mind, including, but not limited to, a fractured neck, fractured arm, and severe femur fracture.  These injuries required lengthy hospitalization and surgical procedures, including a bone graft procedure, and have significantly impaired Natalie Chairez's mobility, resulting in her reliance on a wheelchair and/or walking aid.  As a result of these injuries, Natalie Chairez and Samantha Chairez have endured, and will continue to endure, pain, suffering, distress, and a substantial reduction in their capacity to enjoy life and

to participate in their usual activities, and other harms and losses, all to their damage in an amount reasonably in excess of Seventy-Five Thousand Dollars ($75,000).

279.   As a further direct and proximate result of Defendants' carelessness, negligence, recklessness, deception, and concealment, and of their design, manufacture, distribution, and sale of an unreasonably dangerous product, Natalie Chairez and Samantha Chairez have suffered medical and other treatment expenses, and will continue to incur said expenses in the future, all to their damage in an amount reasonably in excess of seventy-five thousand dollars ($75,000).

As a further direct and proximate result of Defendants' carelessness, negligence, recklessness, deception, and concealment, and of their design, manufacture, distribution, and sale of an unreasonably dangerous product, Natalie Chairez and Samantha Chairez have suffered loss of wages, and will continue to experience a loss of earnings capacity in the future, all to their damage in an amount reasonably in excess of seventy-five thousand dollars ($75,000).

## NOTICE OF INTENT TO SEEK PUNITIVE DAMAGES

280.   Please be advised that after commencement of this action, Plaintiffs intend to move the Court for permission to amend this Complaint to allege a claim for punitive damages against Defendants because, on information and belief, Defendants acted with deliberate disregard for the rights and safety of others under Minn. Stat. § 549.20.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, Natalie Chairez and Samantha Chairez, pray for judgment against Defendants, as follows:

1. Awarding Plaintiffs damages against Defendants in an amount reasonably in excess of Seventy-Five Thousand Dollars ($75,000.00);

2. For injunctive relief:

   a. prohibiting the sale of dusting sprays designed, manufactured, distributed and sold by Defendants containing difluoroethane to minors;

   b. prohibiting the sale of more than one can of dusting spray designed, manufactured, distributed, and sold by Defendants containing difluoroethane per consumer within a 30-day period of time;

   c. prohibiting Defendants from designing, manufacturing, distributing, and selling dusting sprays containing difluoroethane without an effective physical mechanism or chemical composition to deter inhalant abuse.

3. Ordering an abatement of the ongoing public nuisance conditions caused by Ultra Duster;

4. Awarding Plaintiffs pre-judgment and post-judgment interest;

5. Awarding Plaintiffs their reasonable costs and disbursements;

6. Awarding Plaintiffs punitive damages;

7.      Awarding Plaintiffs costs of investigation and reasonable attorney's fees pursuant to Minn. Stat. § 8.31, subd. 3a, 325D.13, 325D.44, 325F.67, and 325F.69;

8.      Awarding such additional relief as the Court may deem just and equitable.

**A JURY TRIAL IS HEREBY DEMANDED BY PLAINTIFFS.**

Dated:  June 26, 2020                    **ROBINS KAPLAN LLP**

By: <u>/s/ Tara D. Sutton</u>
    Tara D. Sutton (#23199X)
    Philip Sieff (#169845)
    Gary L. Wilson (#179012)
    Jason L. DePauw (#0392150)
    2800 LaSalle Plaza
    800 LaSalle Avenue
    Minneapolis, MN 55402
    Telephone: 612.349.8500
    Facsimile: 612.339.4181
    *psieff@robinskaplan.com*
    *tsutton@robinskaplan.com*
    *gwilson@robinskaplan.com*
    *jdepauw@robinskaplan.com*

    ***Attorneys for Plaintiffs***

90748998.1